HARRIETTE P. HARRIS ET AL., TRUSTEES OF THE HILL-STEAD MUSEUM TRUST *v.* ATTORNEY GENERAL ET AL.

SUPERIOR COURT        HARTFORD COUNTY        FILE No. 177347

Memorandum filed May 21, 1974

*Alcorn, Bakewell & Smith,* of Hartford, and *McCook, Kenyon & Bonee,* of Hartford, for the plaintiffs.

*Day, Berry & Howard,* of Hartford, for the defendant town of Farmington.

*Robinson, Robinson & Cole,* of Hartford, for the defendant Avon Old Farms School.

*Tyler, Cooper, Grant, Bowerman & Keefe,* of New Haven, for the defendants Connecticut Bank and Trust Company et al.

*Robert K. Killian,* attorney general, and *Richard J. Lynch,* assistant attorney general, for the named defendant.

ALEXANDER, J. The plaintiffs are the trustees under a trust created by the will of Theodate Pope Riddle which provides for the maintenance of her property known as Hill-Stead, in the town of Farmington, as a museum. It is comprised of about 150 acres of land and includes the main house as well as a number of smaller dwellings and buildings. Among these smaller buildings is "The Gundy,"

which is an old frame dwellinghouse. In their complaint, the trustees seek this court's permission to sell the Gundy and also request other authority in using the funds realized from its sale.

The defendants are the attorney general, representing the public interest; the Connecticut Bank and Trust Company, trustee of a trust under the tenth clause of the will; the Pope-Brooks Foundation, Inc.; and the Avon Old Farms School, Inc. Except for the attorney general, the defendants resist the plaintiffs' petition for sale of the Gundy and also have interposed a counterclaim in which they seek a decree ordering the plaintiff trustees to terminate the Hill-Stead Museum trust and to turn over all the trust property to the defendant Connecticut Bank and Trust Company as trustee under a trust created by the tenth clause of the will for the benefit of the defendants Avon Old Farms School and Pope-Brooks Foundation. The attorney general opposed the termination of the Hill-Stead Museum and urged its continuance in the public interest. He also joined with the plaintiffs in urging the sale of the Gundy. Also as parties are the town of Farmington, the Friends of Hill-Stead, and the Farmington Land Trust, Inc., all of which have been permitted to intervene by order of the court.

I

The fifth clause of the will creates the trust under which the museum has been operating since the death of Mrs. Riddle in 1946. By its terms, the parties are directed to maintain the property "forever as a museum for the exhibition of the articles of artistic interest contained in the main house, and for the education and benefit of the citizens of the villages of Farmington and Avon and the general public." The property consists not only of the land and buildings but also of valuable paintings, art

objects and household furniture which are located within the main house. The testatrix, as stated in the fifth clause of her will, has left a "Memorandum" concerning the maintenance of the museum. This memorandum gives many directions to the trustees. Among them is the provision that the Gundy be maintained as a museum.

The fifth clause of the will provides for termination of the trust if the trustees decide that there is insufficient public interest, or upon destruction or loss of the contents. In the event that the museum and trust should then terminate, all of its assets would pass to the residuary trustee under the tenth clause.

By the terms of the eighth clause of the will, Mrs. Riddle left to a trustee the sum of $400,000, the income from which is to be used for the maintenance of the museum. This sum has more than doubled since the inception of the trust.

The tenth clause provides for a residuary trust. Its income is to be used in large measure for the support of Avon Old Farms School.

In 1955, the trustees were authorized to sell about eighty acres of land on the outer fringes of the Hill-Stead property. Included among these eighty acres was the Gundy. All the acreage permitted to be sold was to be sold free and clear of all restrictions, except the Gundy. The latter was subject to a number of provisos, notably that only a life use could be conveyed.

In support of their request for an order of sale of the Gundy, the plaintiffs offered considerable evidence. From the financial aspect it was demonstrated that for the past three years, the trust had been running at annual deficits ranging from about $6000 to $17,000. Prior to those years, the fiscal picture was difficult, with the number of years of

deficit being almost equal to those of solvency. From 1956 to 1972, there was a net deficit of $42,000. These results have ensued even though admission fees have been charged to visitors. The Gundy has a market value of $75,000, and if sold, the income from the proceeds, plus the elimination of its present maintenance costs of about $3500 per year, would have the net effect of increasing the museum's annual income by about $7000. Evidence has also been produced which demonstrates that, to prepare the Gundy as a museum, repairs and structural changes of at least $42,000 are needed, together with furnishings amounting to a minimum of $55,000. There is no money available to cover these costs, which are necessary if the Gundy is to be constituted as a museum.

In addition to these financial considerations, there are aspects of a more aesthetic or nonfinancial nature which render the Gundy property unfeasible as a museum. Expert opinion in this field indicates that the house and its decor have little or no value from a cultural or historical standpoint or as a museum; certainly it woefully lacks historic or artistic value. This was obvious to the court when it inspected the premises. There is qualified expert opinion that it would not qualify as a "landmark" home. Moreover, its stairways are narrow and steep, thus being dangerous for use by large numbers of the public.

There have also been changes in circumstances since Mrs. Riddle's death which further frustrate the operation of the Gundy. These changes also have taken place since 1955. First, in accordance with Mrs. Riddle's wishes as expressed in the "Memorandum," the property was used in part as a tearoom for the students of Miss Porter's School. After some years, the school is no longer interested in this and has vacated. Also, in accordance with

the memorandum, a relative of Mrs. Riddle occupied a part of the premises as her home. She has died, and there is no longer a need to keep the Gundy to fulfil that aspect of the testatrix' wishes.

Note should also be made of the location of the Gundy. Several parcels of the eighty-acre portion have been sold since 1955, private homes having been built on them. The Gundy now stands in a row of these houses and does not appear to be a part of the Hill-Stead Museum. This result is all the more accentuated by the fact that it is out of sight of the main building and is in no way a necessary or integral part of the museum.

The trustees claim the right to sell the property in question on the basis of the doctrine of approximation. This right cannot be determined without a consideration of the applicable testamentary provisions.

A reading of the will makes it manifestly clear that the Hill-Stead Museum in the main house, with its outstanding paintings and decor, was the dominant factor in Mrs. Riddle's mind in creating this trust estate. The Gundy, on the other hand, is at best only a side feature. Its creation does not even take place by virtue of any provision of the will itself; rather, it appears only in a "Memorandum." Mrs. Riddle had placed the provision for the creation of the Gundy as a museum in a list of her "ideas" concerning Hill-Stead. That the Gundy's use as a museum was not firm or fixed in her mind is evident from the statement in the memorandum that Annie Jacobson and Elizabeth Riddle should be allowed to live at the Gundy "if that is maintained as a museum." Furthermore, and perhaps most important, she states in the fifth clause: "I am leaving a memoranda setting forth in detail my ideas concerning Hill-Stead Museum and the main-

tenance thereof, and I request said Board of Trustees *in so far as practicable* to be guided by my wishes as set forth in such memoranda." (Italics supplied.)

One concludes that the quoted language used is merely directory and not mandatory. It clearly implies an element of discretion in the trustees. This conclusion is further buttressed by a statement at the conclusion of the paragraph in her will pertaining to the memorandum: "Nothing contained in this paragraph shall be deemed to restrict or limit in any way the powers, authority or discretion conferred upon said Board of Trustees by the provisions of this Clause of my Will."

Elsewhere, the will indicates the confidence reposed in her trustees—for example, the trust may terminate "in the absolute discretion" of the trustees. Where confidence and discretion are thus imposed, the court should only interfere on the clearest grounds. 4 Scott, Trusts (3d Ed.) § 382: "Where discretion is conferred upon the trustees of a charitable trust, the court will not interfere with the exercise of their discretion, except to prevent an abuse of discretion. . . . If the trustees act within the bounds of reasonable judgment in the exercise of the discretion conferred upon them, the court will not interfere."

It is felt that in view of the circumstances, both financial and nonfinancial, the trustees are acting properly and not in abuse of their discretion in concluding that the maintenance of the Gundy for the reasons previously specified is not "practicable," within the meaning of that word as used in the will. "Practicable" may be defined as "feasible," "capable of being used or dealt with successfully." The evidence in this case clearly establishes that continued maintenance and ownership of the Gundy is not "practicable."

The defendants assert that the sale of the Gundy is inferentially prohibited by the terms of the tenth clause. There may be some question as to this, owing to a vagueness in the description appearing in the will. The plaintiffs, on the other hand, argue that, even if such a prohibition does exist, their right to sell nonetheless is valid. For the following reasons, it is felt that the plaintiff's position is one which finds support in the law.

General Statutes § 52-499 would probably afford relief to the plaintiffs and permit the order of sale requested if it were certain that "such sale is not prohibited by such will." Whether the will does contain such a prohibition it is not necessary to decide, because the companion statute, § 52-498, provides relief even if there is a prohibition against sale. It provides: "In any case in which real estate is held by a trustee under a trust created by deed or will and, by reason of a change of circumstances or in the condition of such real estate since the creation of such trust, the execution thereof in exact accordance with the terms of such deed or will has become impossible or would fail to secure the objects manifestly intended by the . . . testator in such . . . will, the superior court . . . may . . . order the sale of such real estate . . . ."

These two statutes have been construed in *Bankers Trust Co.* v. *Greims,* 108 Conn. 259. There relief was granted by what is now § 52-498 even though the sale of the property in question was expressly forbidden by the terms of the will. The Supreme Court ruled (p. 266) that the statute as applied gives statutory recognition to the principle that the doctrine of approximation, whereby the general intent of the donor is carried out as nearly as may be, even if the particular method pointed out by him cannot be followed, is applicable to all devises. The statute requires that there be a "change

of circumstances or in the condition" of the real estate. In this case, change lies in the fact that the financial picture is not what the testatrix envisioned—there is a substantial deficit, and a substantial and expensive renovation is required. There are also the other changes previously enumerated, including the fact that experts in the field recognize that the Gundy has nothing to offer as a museum and is not viable as such or attractive to the public.

In addition to this statutory authority, there is also a common-law power in the court as a part of its equitable powers. In applying this power, resort is made to the doctrine of approximation or deviation. Our Supreme Court has stated the rule in a number of cases, including *Shannon* v. *Eno*, 120 Conn. 77, 86, where the Restatement of Trusts is quoted: "If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general" purpose of the settlor. See Restatement (Second), 2 Trusts § 399.

From the facts present, it is concluded that the maintenance and ownership of the Gundy as a museum was impracticable from the very start because it was not viable or suitable as a museum; that as time progressed the expense of its maintenance, together with the bad financial condition of the trust, caused it to become increasingly impracticable; and that Mrs. Riddle has manifested her chief interest to be the museum in the main house. Thus, the prerequisites of the rule quoted above are satisfied. It is noted that, under the rule,

the impracticability need not be one which arises subsequent to the death of the settlor. "[I]t seems that if circumstances justifying an exercise of the power exist at the time the court is called upon to act, the inquiry . . . whether they arose subsequently to creation of the trust, is not a vital one . . . ." Note, 168 A.L.R. 1018, 1022.

Further, with regard to the nature of the condition necessary to invoke the power of the court, "[i]t is not required that the accomplishment of the intent of the testator in the way he planned shall be impossible; proof of the proper facts may be held to constitute an impracticability within the doctrine of approximation." *Second Ecclesiastical Society* v. *Attorney General,* 133 Conn. 89, 94. That case also indicates the law's purpose as being designed to serve the testator's "dominant purpose."

The defendants assert that the plaintiff trustees, by not pursuing financial assistance from outside sources, have failed to prove that the continuance of the Gundy is impracticable, citing *Ludorf* v. *Hadden,* 16 Conn. Sup. 312. Because, however, the property from its inception was not suitable or practicable, the infusion of money could not render it practicable or suitable. Moreover, the evidence does not indicate that money sufficient to maintain and renovate would be realized from such sources. Hence, the Gundy cannot be used to fulfil the testatrix' wishes for two reasons, either one of which justifies the order of sale: for the financial reasons stated, and because of its inherent lack of suitability.

In the court's reaching of this conclusion, certain other considerations were involved. This case, "like all other charitable trust cases, should be decided on the basis of its unique factual circumstances, the particular will that is being construed, and the

public interest as it may be affected by the proposed deviation." *Britton* v. *Killian,* 27 Conn. Sup. 483, 490; *Daggett* v. *Children's Center,* 28 Conn. Sup. 468, 473. The ultimate object is to attain, as nearly as possible, the intent of the testatrix. *Second Ecclesiastical Society* v. *Attorney General,* supra. It is felt that so far as the museum trust is concerned, the primary and dominant intent was to foster the museum and not to add to the assets of the clause ten trust.

In further support of their claim against the sale of the Gundy, the defendants invoke the rule that equity cannot allow a sale under the doctrine of approximation when, by the terms of the will, the donor has provided for a gift over upon failure of the particular purpose. They cite *Bristol Baptist Church* v. *Connecticut Baptist Convention,* 98 Conn. 677, 683, as authority for their position. They assert that, if it is demonstrated that the trust is impossible to administer, rather than to allow a sale the gift over to them as tenth clause beneficiaries should take effect. Their position would perhaps be correct if the Gundy were the only property comprising the trust. Such, however, is not the case; it is only a very minor part of a much larger trust. For that reason alone, the rule of *Bristol Baptist Church* v. *Connecticut Baptist Convention,* supra, is not appropriate. Moreover, to apply its terms in this situation would be counter to Mrs. Riddle's dominant purpose and intent— namely to maintain the main house as a museum.

In their brief, the defendants claim that the allegations of this complaint are insufficient to justify the prayer for relief. Without a detailed discussion of the allegations, it is sufficient to observe that they adequately allege the necessary facts. See *Stevens* v. *Neligon,* 116 Conn. 307, 311.

An order may enter authorizing the plaintiff trustees in their discretion to sell the Gundy on such terms and to such persons as in their judgment is in the best interest of the Hill-Stead Museum. This order is granted in accordance with the prayer for relief, except that principal may not be used to maintain the property.

## II

By counterclaim, the first prayer for relief sought by the defendants is an injunction restraining the plaintiffs from selling any property held by them in trust. For the reasons previously stated in connection with the complaint, and also for the reasons stated below, the defendants' request is denied.

In their second request, the defendants ask the court to restrain the spending of any portion of the principal of any funds held by them. As the defendants properly point out, there is no power in the trustees to spend the principal, except as permitted by the court. The trustees have been permitted to spend the principal of funds realized from sales only in case of necessity to replace essential property of the museum. The trustees by virtue of a 1955 judgment were authorized to sell about eighty acres. To the present time they have sold about thirty acres, realizing as net proceeds from the sale the sum of $157,168, which has been placed in a special fund. Up to December 31, 1972, $55,915 of income has been realized by the fund. Capital or principal has been used to the extent of about $41,000. The defendants claim that there has been an unauthorized invasion of the principal of the special fund to the extent of $30,913. It is concluded, however, that they have not sustained their burden of proof as to this allegation. It is not found that the principal has been used for purposes other than the replacement of essential property.

In reaching this conclusion, all the museum properties, including the outbuildings, are construed as being subject to the "replacement" portion of the 1955 judgment, because it provided for the use of the proceeds of sales for the benefit of the Hill-Stead Museum, including all property appertaining thereto.

The defendants request the court to order that no further invasion of principal be made, even for the replacement of essential property. It is felt that the present financial condition of the museum is not shown to be sufficiently strong to justify such a change.

In their brief, the defendants appear to seek an injunction of a general nature restraining the trustees from violating their trust. Since no such violation is threatened or indicated, no such order appears to be required. It is sufficient to observe that the plaintiffs are required to be loyal to their trust, as stated by the Supreme Court when it considered this trust in the case of *Conway* v. *Emeny,* 139 Conn. 612.

As a third prayer for relief, the defendants ask this court to order the plaintiffs to use their power to terminate the Hill-Stead Museum because of insufficient public interest, or that portion concerning the Gundy, and, further, to order the parties to convey and transfer all properties and assets to the defendants in their capacity under the tenth clause of the will. The defendants also request the court to rule that the plaintiffs have abused their discretion in this respect. The portion of clause fifth on which the defendants rely is: "If at any time after three years from the date of probate of this will, the board of trustees of the Hill-Stead Museum, by affirmative vote of at least two-thirds of the members thereof, shall in their absolute dis-

cretion determine that there is not sufficient public interest in the Museum to warrant continuing to maintain the Hill-Stead Museum as such, the trust created by this Clause Fifth of my will shall terminate and the trustees . . . shall convey, transfer . . . all property remaining to the residuary trustees—the defendant, Connecticut Bank and Trust Company."

In order to be operative, the quoted clause requires that the trustees, in their absolute discretion, determine that there is not sufficient public interest to warrant the continuance of the museum. The evidence produced by the defendants falls quite short of establishing that there was a lack of public interest. On the contrary, evidence has been produced to demonstrate a real and vital public interest. It is one which is not restricted to Farmington and surrounding towns but is nationwide and worldwide. Attendance figures at the museum support this conclusion.

As noted previously, it has been stated that where discretion is conferred on trustees of a charitable trust the court will not interfere with them in the exercise of that discretion, except to prevent an abuse. 4 Scott, Trusts (3d Ed.) § 382. The evidence in this case does not justify a finding of any such abuse. With regard to this exercise of discretion reference is made to *Conway* v. *Emeny,* 139 Conn. 612. In view of the testimony advanced, this prayer for relief is denied. In the alternative, the defendants pray that, at least, the Gundy property be turned over to them. In view of the ruling concerning the Gundy made as to the plaintiffs' complaint, this request is also denied.

The fourth prayer for relief claims a decree that the trustees have abused their discretion in failing to terminate the trust because the contents

of the main house at Hill-Stead are "impaired." This claim is based on the portion of clause fifth of the will which provides: "If at any time . . . the main house at Hill-Stead or the contents thereof, or both, shall be destroyed or impaired to such an extent . . . that it is no longer advisable to maintain the Hill-Stead Museum as such, the trust . . . shall terminate." The defendants assert that, because there is inadequate insurance and inadequate security, the contents of the museum are "impaired." It seems clear, however, that the word "impaired," as used, means physical impairment. The coupling of the word with "destroyed" so indicates. The use of the word "salvaged" subsequently in the same clause indicates that physical damage is meant.

The defendants go on to request in the alternative that if termination is not ordered on the ground of impairment, the court should order the plaintiffs to improve both the insurance coverage and the security systems.

The duty of trustees generally in preserving assets and in acquiring insurance is "to take reasonable steps to procure such insurance as is customarily taken by prudent men." Restatement (Second), 1 Trusts § 176, comment b. "It is today a general custom among prudent business men to insure buildings in their charge against loss by fire; and ordinarily it is the duty of trustees holding property for remaindermen to see that such provision is made." *Willis* v. *Hendry,* 127 Conn. 653, 661. This is not, however, the practice with regard to museums, because the evidence reveals that most museums, even the finest, insure in some cases for only nominal amounts. Others do not insure their collections at all. The chief reason is that art treasures are irreplaceable.

Apart from the fact that the defendants are not remaindermen, but rather mere contingent beneficiaries, the will of Mrs. Riddle indicates that she had no intent that the assets, or their money equivalent from insurance proceeds, should be kept inviolate for the contingent beneficiaries under clause ten. The museum was created for the benefit of the public, not for the benefit of any third party, including the defendants. *Conway* v. *Emeny*, supra. Further evidence of Mrs. Riddle's intent is found in the reference in the will to textbooks in museum management which advise that few museums provide insurance coverage for their collections. There is also the question of finances and the tight budget under which the museum has operated.

Mrs. Riddle's will also provides in clause five that if the trust should terminate because of destruction of its contents, "any works of art which are salvaged" are to be sold and the proceeds paid to the residuary trust. There is no mention of insurance. The only reference to insurance in the will is a perfunctory one in clause eight. Significant also is the admonition in the will that no additions to the museum's contents are to be allowed. It is clear that Mrs. Riddle did not intend that her art objects, if lost or destroyed, were to be replaced by the purchase of other ones, or that insurance for that purpose would be necessary.

It is also claimed that the trustees have abused their discretion in failing to provide for adequate security against theft and fire. Without elaborating on the details of the security system in effect, it is sufficient to observe that it has been approved by the police chief of the town and affords reasonable protection, under the circumstances involved. "It is the duty of the trustees to exercise that care and prudence which an ordinarily prudent person would who was entrusted with the management of like

property for another." *Willis* v. *Hendry,* supra; *Reiley* v. *Healey,* 122 Conn. 64, 71. The defendants have failed to prove that the trustees do not measure up to this test. It is found in fact that their conduct as to security does satisfy the rule.

It seems to be agreed by the parties that some measures for improvement as to fire detection and security should be considered. They are now under consideration. There is no evidence that funds are now available to pay for these additional expenses. Until they are available, it is not considered appropriate to resort to the extreme remedy of an injunction. *Labbadia* v. *Bailey,* 152 Conn. 187, 192. Moreover, an injunction ordinarily issues in the sound discretion of the court; *Gerald Park Improvement Assn., Inc.* v. *Bini,* 138 Conn. 232; and should be granted, if at all, on the basis of the situation as it exists at the time of trial. *Labbadia* v. *Bailey,* supra. If the financial situation should later permit, the relief which the defendants now seek could become a proper remedy.

As a general observation, this opinion should record that the court, in company with counsel, inspected the entire premises. It was apparent that the upkeep and care are of a high order and speak well for the plaintiffs' fidelity to their trust.

In view of the rulings made in this opinion, it is not necessary to consider the plaintiffs' claim that the defendants, as contingent beneficiaries, lack the proper standing to assert the claims which they have made.

Judgment may enter in favor of the plaintiffs on their complaint and on the counterclaim in accordance with this opinion. Counsel for the plaintiff trustees is directed to submit a proposed judgment file and to distribute copies to counsel of record.